All right, there are five cases before the court today, one of which is submitted on the briefs. So we have four cases for oral argument. The first is document number 181635, SIPCO v. Emerson Electric. I understand, Mr. Barney, that you want five minutes for rebuttal? Yes, Your Honor. Okay. This is an appeal from a decision-dependent trial and—oh, we have the wrong briefs. Sorry. From the PTO. Sorry. Anyway, we're going to get organized before you start. In any event, are we ready? Yes. We are ready, so you may begin. Thank you, Your Honor. May it please the Court? I'd like to begin with the threshold question of whether the Board had jurisdiction over this case. The Board's decision should be vacated because the 842 patent is not a covered business method patent under the statute. Instead, it falls into the exception for technological inventions that Congress specifically excluded from the CBM jurisdiction. The claims here are directed to hardware components and technical aspects of a communication system. Specifically, the patent describes the invention, I'm quoting now, as a general-purpose radio-frequency transceiver having an open-ended architecture that readily adapts it for a wide variety of uses and applications. Is it your position that we have to decide whether it's a CBM on a claim-by-claim basis? I believe that's what this Court's holdings have indicated, that it's incumbent upon the petitioner to identify a claim in the patent that falls within the CBM jurisdiction. Okay, but if there's even a single claim, then the patent is a CBM patent, right? I would concede that, Your Honor. Okay. Well, what makes this a CBM patent? Is it, for example, let's say that the figure 1A, if we didn't have that, what's left that would make this a CBM patent? Your Honor, my answer is it's not a CBM patent. The Board felt that what made it a CBM patent is that there are two claims that associate the communication system with a vending machine or an ATM machine. In our briefs, we dispute that, that actually satisfies the financial aspect of a CBM patent. What I'd like to focus on here today is whether it falls within the technological invention exception to the statute. But to be clear, we don't think this is a CBM patent. This is a communication system. It's technological in nature. In 1997, when this patent was filed, it addressed technological problems that existed at the time. One of those problems was the fact that specialized systems required specialized transceivers. And the patent addressed that by describing an open architecture transceiver. So where is, let's put aside the CBM question, where is a transceiver in this patent? Look at figure 1A again, I see a transmitter and I see a receiver, but I don't see a transceiver. Your Honor, I'm not sure you would see it in 1A. I believe that the transceiver is... So 1A does not speak to claim 1? I don't think, I don't know that 1A in and of itself is commensurate with claim 1. I think you would have to look at other figures such as 2A and 2B. What is the figure 1B? 1B shows you the innards of the ATM and then you have an RF receiver box and then you have a transmitter box. That's correct. So overall, what we're looking at are the innards of the ATM along with the controller. That's one aspect of it. The claims also require the transceiver and they also require the... Claim 1 doesn't say the magic word transceiver. Right. I mean, I understand different parts of the specifications of the transceiver, but we're just talking about a network of addressable devices, I think is the way that the claim 1 is written. Well, claim 1 definitely does talk about a transceiver. It requires a low-powered transceiver that's configured to wirelessly transmit a signal. Oh, okay. Well, then for figure 1A, that's the key fob, isn't it? No, Your Honor. My understanding is that the transceiver does not correlate to the key fob. It would correlate to what is integrated, for instance, into figure 3. You would see, for instance, a wireless host transceiver. I believe that's the transceiver that's being referred to in figure 1, not the key fob. Now, the board's focus was on claims 3 and 4. So, does your argument depend on your contention that you can't look at claims 3 and 4 because they weren't challenged or because they were disclaimed? No, Your Honor. I'm not asserting that here today. For my purposes today, I will concede that claims 3 and 4 were properly analyzed by the board and can be properly looked at to determine whether this is a CBM patent. My position is that even if you look at claims 3 and 4, this is not a CBM patent because, among other reasons, it falls within the technological invention exception that Congress excluded from CBM jurisdiction. So, let's focus on 3 and 4 there, though, because is that not a claims that relate to a financial product in that they talk about the ability to communicate with the ATM, for instance? Your Honor, I'll concede that's a closer call. As you can tell, I'd like to focus my arguments today on the other aspect, which is whether it falls into the technological invention exception. However, in our briefs, we did challenge whether that actually satisfies, whether it's sufficiently related to a financial service to actually satisfy that first prong of the CBM analysis. And I do maintain that. There's a line of cases that this Court analyzed where the PTO had been misapplying the statute and essentially saying anything that even remotely relates or could tangentially relate to a financial service is included. And this Court said, no, you have to hew close to the statute, and the statute doesn't say related or tangentially related, it says it has to be used in the practice of a financial service. I could argue, and I would argue, that having a generalized communication system where one component of that is associated with an ATM is really not that much different than what this Court said is an improper analysis in, I believe it was Blue Calypso, and saying that just because something is associated with a financial aspect does not make it a financial-related patent. That's still our position, however, I concede that's a closer call. What I think is less of a close call is whether this is a technological invention under the exception that Congress carved out for CBM patents. So the Board said the claim elements are all old, conventional, generically recited devices, right? Yes. The Board followed its own regulation, and one aspect of that regulation is whether the claim is novel and non-obvious. This Court has criticized that aspect of the test. Well, wait a second. I didn't see the Board's decision keying off on that prong of its regulatory definition of technological invention. It was, as I understood the Board's decision, it was devoted to the question of whether this claim is directed to a technological solution for a technological problem. And it didn't address the other prong, the prong you just referred to, as to whether or not this claimed invention represents a novel and non-obvious technical improvement. Fair enough, Your Honor. Just to be clear, this Court has criticized that first prong, and you may be right that the PTO is keying off this Court's criticism and focusing more on the second prong. So let me address that second prong. The second prong merely recites or restates the language of the statute. And this Court has held that that second prong of the regulation doesn't offer any additional help to the Court in determining what is a technological invention. You're saying the statute says technological solution for a technological problem? The statute says that what's excluded are technological inventions. The regulation's second prong says that... Right. So I thought you just said that the statute said technological solution for a technological problem, and that's not right. That's not correct. It only says technological invention. That's correct. And then the PTO, through its regulation, defined that to mean, among other things, a technological solution to a technological problem. Well, it doesn't say among other things, actually. That's the only thing the regulation says. Well, the other thing it says is a novel and non-obvious technological link, so there is another thing. There's another thing. This Court has... You're wrong to say that's the only thing in the regulation. No, this Court has criticized the first prong of being novel and non-obvious. And there's no connection between being novel and non-obvious, and whether or not it's technological in nature. Clearly, you can have a technological invention. Can you get down into the facts of the case and explain why, in your view, this is a technological solution to a technological problem? Sure. The patent overcame at least two problems, technological problems, in the prior article. One was the problem that you had to use specialized transceivers for specialized networks. It overcame that problem using what it called an open architecture transceiver. The open architecture transceiver allows different companies to program the instruction codes to perform different functions, even though they're still using the same generic open architecture transceiver. And that is reflected in the instruction data limitation and all of the claims it issued. That is a technological solution to a technological problem. The other technological solution was the use of a low-power transceiver. The inventor explained that the purpose of the low-power transceiver was to avoid the problem of interference and unlawful interception of data. That's a technological problem, and the technological solution to it was to use a low-power transceiver. That's reflected in all the claims. The board did not give credence to those problems and solutions. What the board said was, this company- Explain to me how those are reflected in claims three and four. They are both reflected in claims three and four, correct, Your Honor. The open architecture limitation or problem is reflected in the instruction data limitation, which is in all of the claims, including three and four. And the preventing interference and unlawful collection of data is reflected in the low-power transceiver limitation, which is in all of the claims, including claims three and four. What the board focused on was, the board said, well, this is really just solving the problem of automating what was previously a manual process of monitoring ATMs and vending machines. We disagree that that's the only problem that was solved here, but even if it was, automating a manual process is a technical solution. If you want to automate a manual process, like the cotton- Claim one doesn't say anything about ATMs or vending machines, right? It's more- Claims three and four. I'm talking about claim one. That's correct, Your Honor. So claim one is more generally directed to the idea of, how do you establish a communication between some remote device and a central location? I think that's fair. That's fair. And then, rather than going through the trouble of setting up some direct network line between any remote device and a central location, it decides to use some form of wireless communication between that remote device and some intermediate node. And that intermediate node is, in fact, networked to the central location somehow. I think that's fair. You're not claiming anything involving the central location? I believe that the claims do recite a central server. Well, they recite transmitting to a central location, but for example, with the ATM example, the central location would be a bank. It could be. That's correct. So you're not claiming the bank or the ATM? No, Your Honor. Right? That's correct. So really, that particular part of the patent is only the communication between what we see in the figure with the key fob and the ATM? That's correct. So the only thing that this invention does is give you access to the ATM? I think that would be a fair characterization. Right. So it just allows you to use the ATM. It has nothing to do with the financial transaction itself. That's right. But for that embodiment, as I understand it, the true purpose is to try to communicate between the customer with the key fob and the central location, I guess, the bank, not just this intermediate node that I'll call the ATM machine. There is an embodiment in there that talks about that, but... I'm talking about claim one. Claim one. There's a wireless communication between some device and some other device. That's right. And then that second device has a communication link set up with the central location. That's right. It's completely agnostic to what use you're making of this communication system. Claim one is completely agnostic. It is purely a communication system claim. Claims three and four, associated with an ATM or a vending machine. All right. You're way into your rebuttal time. We'll give you two minutes for rebuttal. Thank you, Your Honor. May it please the court. I'd like to respond to the arguments with respect to whether this was properly instituted in the CBM proceeding. The statute uses the phrase used in practice administration or management of financial product or service, and clearly claims three and four, the device is used in the financial product or service, being the vending machine or the ATM. Well, it's used in relation to. We just heard that the only thing that happens between the remote device and the ATM is access to the ATM. Well, Your Honor, what the statute... Can you use a remote device to say, I want to deposit? It would include those financial transactions. Yes. I think at that point, you have to go back to the ATM and use a keypad in order to complete the financial transaction. It does not specify or limit the instructions that can be given. But what's clear is that, as the statute provides, it's an apparatus for performing operations used in the practice of a financial product or service. The financial product or service here is not something that is just a hypothetical or speculative use of the invention. Their argument is as though we were saying claim one itself establishes that this is a CBM patent. And that's not the argument, and that's not what the board held. What the board held was that claims three and four specifically recite the ATM and the vending machine. And so this apparatus of claim one is now being used in the practice of the financial service or product, which is the vending machine or ATM machine. And so that was the basis of their conclusion. And there's... I'm sorry. Does the statute provide any guidance as to what a technological invention is? Well, no, Your Honor. And the board's rule, which basically just recites the statute and says not a technological solution to a technological problem, has been criticized as not providing a lot of additional guidance. But I think here this statute, that test actually applies fairly clearly because we know from the patent what the problem was that was being solved. And it's not a technological problem. It's a financial problem. And that's what the board said at page 819. The problem being addressed is cost. The cost of sending a service person out to do the periodic checks on the vending machines or the ATMs, and that there might be a lengthy period between those checks. That's at the bottom of column 1 and top of column 2. I guess the problem I have with that argument is that the patent talks about other things as well. You are right that it talks about, as a prominent example, the need for servicemen to, I guess, blindly and periodically go and check on certain machines to see if they're still operating. But aside from that, the patent also talks about how there are a wide variety of circumstances in which it is desired or desirable to communicate information to a single location or to communicate from a remote device to a predetermined location. And so that now kind of spokes out what the patent is trying to accomplish, which is that general idea of some remote device that can't otherwise directly communicate to some central location. And now it wants to try to build up some kind of communication link between this remote device and the central location. But what we have here is exactly what the court has considered in cases such as Versada and Affinity Labs, where there is a longstanding human endeavor, such as taking a video and taking it to a new region or calculating a price. And what the patent is doing is saying, we're going to use computers and their elements to perform that same human endeavor. And that's what this patent is doing. Forever, we've sent service people out to check on ATMs and vending machines. And this is now going to automate that process. That's all that's happening. In order to automate that process... Let's take this out of the vending machine ATM embodiments, because as I look at claim one, it's not restricted to just vending machines. Only claims three and four, you're right. And ATMs. So now we're just talking about the challenge of a remote device trying to communicate, for whatever reason, who cares what the information content is, to that central location. And here, they've decided, it's not just, let's send an email from node A to node B, or let's just transmit somehow, anyhow. They've decided to create this two-step process, where instead of using a direct link, you do a wireless communication from that remote device to some intermediate node. And then the intermediate node has a direct communication link to that central location. So you've got now a two-step process here, which to me sounds a little more specific than just some broad-based generic notion of communicating from node A to node B. But what's the problem? Each of those things, and this is what the board analyzed. Each of those things is a generic element being used in its traditional, conventional manner. And so all they're doing is using these generic elements to do what humans have long done, which is to go out, see that there's a problem, and then go and call that information back in to the central location. But do you agree it's a two-step process? One, the first step is a wireless communication with a low-power transceiver. And then the second step is some direct communication link from that intermediate node to the central location. But that's not a technical solution to a technical problem. That's just automating something that has always happened. Arguably, it could be a technical solution if you look at it in this way. You're not going to go through the process of setting up a direct communication network between every remote device in the central location. Instead, you're going to rely on these intermediate nodes, which do have a direct communication link. Then you use a wireless system to have these remote devices communicate to the intermediate node. And you do that with a low-power transceiver, so you avoid contention, as well as the possibility of unwanted interceptions of that wireless transmission. So I'm beginning to see at least something here that, well, it looks like a little more thought has been put into the communication process beyond just this broad-based idea of automating the Pony Express. Well, your honor, let me point to the, and this is again in column one and column two, that what has happened historically is that the service person goes out, discovers that there's a problem, and has to, quote, communicate that information back to the central location. So the service person goes and uses a telephone. And that's all that's claimed, because the interface is linked to the public telephone system. So all you have to do, that's already part of the traditional process. Use the public telephone system to call back to the central location. So now, usually that's been done by a human. Now it's being done by a wireless radio link that's going to call using the same telephone system. That is not a technological problem, because those wireless low-power radio transmitters are ubiquitous. That was something that they conceived. They cited the FCC guidelines on that. They acknowledged that. It's broader though, right? Let me just make sure that I understand the board's analysis and make sure that we're on the same page as to what it is. The board said that if Claim 3 or Claim 4 fell within the scope of CBM and did not fall within the technological invention exception, that that's the end of the inquiry, right? That, in other words, once even one claim in a patent falls in CBM, then the whole patent is CBM for purposes of being able to institute, right? That's right. And can you, I mean, I don't understand that there's really a dispute on that. That there's no dispute on that, Your Honor. So it's just, but those are dependent claims, and they depend from the independent Claim 1. Now, what this court held in Versada, and this is cited at page 17, is that the technical feature is not satisfied if the elements are nothing more than general computer system components used to carry out the claimed process. So if they're just generic computer elements used in their conventional manner, then that's not going to satisfy the technological process requirement. The devil's in the details, though. I mean, Vastom, for example, was all conventional components and technology. Nevertheless, there was an interesting arrangement where the internet filter wasn't located at the person's computer. It was at the server. That's right, Your Honor. But the board goes through and traces through each of the elements. Claim 1 has five elements, a low-powered transceiver, an interface circuit controller, communication link, central station. And each of those is conceived in the specification to be a routine generic element. The low-powered transceiver is reflected, this is Appendix 82, the abstract, directed to a general-purpose transceiver, having a receiver for receiving information, signal and transmitter, computer to transmit. It was well known, this is at A2095, columns 662 to 64, by those skilled in the art, a variety of transducers can perform this functionality. That's converting the electrical signal to electromagnetic. They acknowledge, this is 895, column 5, 23 to 25, that wireless communication using low-powered transmitters was, quote, known for activating automobile alarms, for example. CIPCO cited the FCC bulletin confirming that low-powered transmitters were, quote, used virtually everywhere. The interface circuit, the interface circuit is designed to interface with typical standard telephone circuitry. The interface will be appreciated by persons skilled in the art and need not be described in detail herein. That's Appendix 97. Controller, the controller can be a general-purpose microprocessor or microcontroller. Communications link, that's the public switch telephone network that was always used. Central station, the actual structure is not necessary to describe. I still don't think you're answering Judge Chen's question, and his question is not whether or not all of those things were known, but whether the way they were put together in this particular circumstance were not known. I mean, that's where BASCM is. Well, Your Honor, they, they, they're, each of those elements is being used in its, in its normal conventional function, and the, the things that they cited to the board as distinguishing it, as, as being the, the, the sort of technological problem that was being solved all relate to claim, features that are not claimed. For example, they say that it, it addressed the problem of interference, or it addressed the problem of interception. Those two problems are specifically tied in Column 6 to an extremely low-power transmitter. The extremely low-power transmitter is conceded at the bottom of Column 5 to the top of Column 6 as preferably. It is not required. And therefore, if the technological problem that they're claiming is solved is only solved by something that is not required, but only a preferred embodiment, then the claims aren't directed to that. What if we read low-power as it's used in all the claims to refer to short-range transmissions, short-distance transmissions? Then, you know, then it's consistent with what's being described in the ATM embodiment to, to avoid contention and possible interception. Well, Your Honor, that's not something that they claimed about low-power generally. They only identified that as solved by extremely low-power, meaning within a few feet. What the Board found, and it's supported by ample evidence with Mr. Geyer's testimony, is that low-power transmitter is actually something that the FCC regulates. It has a whole brochure on this. And that would include for the, for this type of thing, something that could be powered up to a watt and would have transmission up to a mile. I'm just saying, hypothetically, you know, what if we read the patent as an integrated document and conclude that the term low-power transceiver, as used in the claim, is referencing the notion described in the spec of wanting to avoid contention and, and interception. And therefore, low-power transceiver is, is about short-range transmissions. Well, Your Honor. Then what? Well, first of all, I would disagree because that's not what it recites. It recites only low-power and low-power conveys only that it, it uses, consumes little power, not something specifically with respect to the transmission range. And I also want to point to the court to the fact that the board made specific factual findings that are reviewed only for substantial evidence about what a PECIDA would have understood low-power to mean. And low-power. But if it's de novo, if reading the patent, it's clear enough to us, then you don't have to resort to extrinsic evidence, right? But the, but the underlying factual finds of what a PECIDA would have understood low-power to mean is a, is a factual finding based upon Mr. Geyer's testimony, which is supported by the FCC regulation. If it's ambiguous in the, after looking at the intrinsic evidence, I understand. So, get back to my question of what, what next, if we read low-power transceiver to not merely encompass short-range transmission. Then it still would not, it still would not satisfy the test as explained by Versada and because it would still be merely a generic component. And they concede that low-power transmitters are generic. In whatever meaning you have, they concede that those are generic, ubiquitous, used almost everywhere, right? And they're being used for precisely their, their normal process, which is to transmit wirelessly to a receiver. And so, nothing that is done here is novel or unobvious and, and it goes to that element as well, which also has to be satisfied. The board focused on the, the fact that it's not a technological solution to a technological problem. Hypothetically, hypothetically, what if the court were to conclude that based on our reading of this patent, these claims have a technological solution to a technological problem. And the board was wrong to conclude otherwise, because it just chopped up the claim into individual pieces without looking at the larger claim and what it was trying to accomplish. Would we have to remand it back for the novel and unobvious? No, because that's, because that, for two reasons. Well, I don't see the board addressing that problem. Well, Your Honor, they didn't address it in the context of the CBM, but that's also the test, obviously, under, under 101 and the obviousness. They made all of the underlying... I can't be sure. I mean, I'm not sure what they really mean by non, novel and unobvious technical solution, because yes, it does sound like 102 and 103, but as we all know from cases like Versada, this court's a little suspicious of the idea of putting the whole, I don't know, cart before the horse and at the institution phase, deciding every single patentability issue to figure out whether to even institute a CBM. And so I guess maybe the better call would be to have the board tell us what it thinks on how it should apply its own regulation about this novel, non-obvious provision. Your Honor, I don't think that's necessary because the board has already told us that this patent is addressed to automating a longstanding human activity in order to solve a financial issue, which is price. It's just trying to do it cheaper. And they've said that there is no technological invention here because all of the elements are generic. They're used in their common... So you're saying we should pull out of the 101 analysis and the 103 analysis the analysis that probably should have been done up front if that regulation means what it says? Well, I don't think that it needed to have been done up front because these are alternative grounds, that either of them is sufficient. And many of this Court's own cases address the CBM threshold question on either of the two, whether it's novel and unobvious or whether it solves a technological problem with a technological solution. I don't see in the statute where Congress directed the PTO to issue regulations that would essentially bring in, as Judge Chen said, all the other provisions of Title 35. Your Honor, I am entirely comfortable with the Court going back to the statutory test because there is no question that in this case what is claimed is being used in the practice of a financial product or service. The financial product or service are explicitly recited, which are an ATM and a vending machine. I can't think of a more quintessential financial product or service. And that this purported invention is being used in it is recited in the claim itself because it's associated with that. And associated has to mean used in connection with. And that is in itself. This is not the case. I understand the Court's frustration and the Court has expressed it in many instances. But in each case, the Court has found that they didn't need to really resolve that, send it back to the Board, make a point, because the case didn't require it. This case is one that is on all fours with the statutory test. So I would urge the Court, and it is de novo in that sense, to say that because this claim explicitly recites an ATM and a vending machine, and that the apparatus that is claimed is used in performing the operations of those financial product or service, that it satisfies the test. And I don't know that the Court needs to go any further. Is it your view that the regulation really makes no sense in light of the statute? I think that it is helpful, Your Honor. And I think that it is helpful here. And this Court has found it helpful, as it did in Versada, when it engaged in precisely the same analysis, saying that because what is claimed are using well-established generic elements of a computer in their customary manner, that can't be a technological solution to a technological problem. Okay. We're way over time. I'll give you five minutes for rebuttal. All your rebuttal time, because we went over with him. I actually don't have that much, Your Honor, unless you have questions. I think the issues have been well-ventilated. One point I did want to make is I cited to blue clips earlier. Counselor, I have a question to start off with. Yes, Your Honor. Maybe you'll have to use all that time. Let's look at the vending machine figure. And basically, it seems to me, so you have the transmitter is letting the central station know we're out of barbecue chips, come and put some more chips in the machine, correct? That's one aspect, yes. How is that a technical problem? How involving, requiring a technical solution? What the practice has been is that the potato chip man makes his rounds and sees that there's a need for more barbecue chips and puts them in there. And now this invention purportedly replaces the potato chip man and lets the central station know we need more barbecue chips. Someone's got to go out there and put them in. What's the technical problem here? Well, first of all, disagree that that's the only technical problem addressed here. But I'll take your question at face value, because that's what the board said. The board said, hey, the technical problem here is automating what was previously done manually. Even if you take that at face value as the alleged technical problem, the solution to that is still a technological solution. Automating a manual process is a technical problem. When you want to automate something that's being done manually, you call an engineer to develop a system to automate it. You don't call a financial planner. You don't call an economist. Are you saying that we should ignore the analysis where the board said, well, it may be automating it, but it's all done with generic components. It's not novel or unobvious. Well, certainly, I don't think this court should ignore anything the board did. You should take everything the board did and analyze it. That portion of the board's analysis, by the way, doesn't come from its own regulation, and it doesn't come from the statute. It comes from a series of guidelines that the PTO has published subsequent to some of this court's rulings. The actual regulation, step one, is it novel and unobvious? I think we're all in agreement that that's not a very workable step of the analysis, and this court has criticized that first step. Second step of the PTO's regulations, simply ask, is this a technical solution to a technological problem, which is really just parroting the statute? I would argue that if what this... If a regulation parrots a statute, then... You don't owe it any deference. Right. I would argue that, respectfully, if what the board did here and said that these claims are really just solving a financial problem rather than a technical problem, really, that's where the rubber meets the road. That's the basis of the board's decision. I would argue that that would swallow almost the entirety of all patents. All patents that are designed to make something faster, quicker, cheaper, more efficient are ultimately solving a financial problem. The cotton gin solved a financial problem, but it did it through a very technological solution. And so I think that's where the rubber meets the road here. What you need to do is explain why the manner of automation here, as recited in the claim, is not just mere generic automation, but there's something nifty to your so-called technological solution. So why don't you talk like that instead of this more high-level talk? Sure. But is your position that it doesn't have to be nifty in order to get out of the CBM and maybe be subject to IPR instead? My position is, according to the statute and the board's regulations, it actually doesn't have to be so-called nifty. It has to be technological in nature. Congress did not want... Where's the technological solution in your claim? Right. Well, I've gone through the technological solutions. The low-power transceiver solved a problem. Now, my colleague says that's not in the claim, but it is in the claim. It's a low-power transceiver. What's the technological problem that is solved here? That is a logical problem. The technological problem. What's the technology that has been revised or rethought as a result of this invention? One was the need in the prior art for specialized transceivers for each type of specialized communication network. A big part of this patent is... But you don't have specialized transceivers here. I know. We have open architecture, non-specialized transceivers. That was the technological invention. The patent talks about that. That is the improvement, that you went from having to program these specialized transceivers in the prior art. Now you don't. You just use a generalized generic transceiver and you do the programming at the central site so that you assign functions to these instruction codes that are then decoded, not by the transceiver, but at a central site in order to perform functions. That was the technological solution to a technological problem. That existed in 1997. The other problem that was solved was this idea of interception of data and interference. A very much real-world problem at that time. It was solved through the use, as Judge Chen went through earlier, instead of using long-range wireless transmissions to try to reach a faraway central server, you use very short-range transmissions and you use a series of generic intermediaries so that you can relay information, essentially in confidence, in a very short and a very small area and have that information picked up with very little risk of interference and unlawful interception and then relayed to the central service for further processing. It's a two-step, short-hop, long-hop communication system. That's right. From the remote device to the central location. Correct. That is definitely part of this. The briefing had some debate about how to understand the claim limitation, establish a communication link. I didn't understand it. Your Honor, I'm no longer arguing that. I think it's safe for you not to focus on it. Okay. And you're out of time, so that's perfect. Thank you, Your Honor.